1

2

3

4

5

6

7

8                        IN THE UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JASON TYRONE HOLDMAN,

11            Petitioner,                    No. 2:08-0183 WBS CKD P

12       vs.

13   TIM VIRGA[1],                           ORDER &

14            Respondent.                    FINDINGS AND RECOMMENDATIONS

15   _____/

16            Petitioner, a state prisoner currently confined at California State Prison-

17   Sacramento, is proceeding pro se with a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

18   This case proceeds on the third amended petition filed September 30, 2011.  (Dkt. No. 37

19   ("Ptn.").)  Petitioner challenges his 2005 conviction for first degree murder and attempted

20   robbery with a special circumstance and a sentencing enhancement.  Petitioner claims that he was

21   entitled to jury instructions on lesser-included offenses, and that the trial court excluded certain

22   impeachment evidence in violation of his due process rights.  Upon careful consideration of the

23   _____

24        [1]  Respondent requests the substitution of Tim Virga, the current Warden of CSP-
     Sacramento, as the correct respondent in this matter.  See Stanley v. California Supreme Court,
25   21 F.3d 359, 360 (9th Cir. 1994) ("A petitioner for habeas corpus relief must name the state
     officer having custody of him or her as the respondent to the petition."); Rule 2(a), 28 U.S.C.
26   foll. § 2254).  Accordingly, the court now substitutes in the correct respondent.

1  record and the applicable law, the undersigned will recommend that petitioner's application for

2  habeas corpus be denied.

3  <u>BACKGROUND</u>

4  I.  <u>Facts</u>

5     In its affirmation of the judgment on appeal on November 29, 2006, the California

6  Court of Appeal, Third Appellate District, provided the following factual summary, in which

7  petitioner is identified as "Defendant":

8    Guy Godfrey, Shawn Ingle and Bryan Breen were cousins and
  close friends. Godfrey and Breen spent the evening of September
9    18, 2003, at a friend's house where they used methamphetamine.
  Later, in the early morning hours of September 19, Godfrey and
10   Breen met Ingle at a 7-Eleven store at the corner of Northgate and
  El Camino. Ingle was driving a car he had stolen on Darwin Street
11   near where Godfrey lived with his mother. The three young men
  decided to buy a $10 bag of marijuana. Godfrey rode with Breen
12   and Ingle followed in the stolen car. Although they made two or
  three stops, they were unsuccessful in finding any marijuana to
13   purchase.

14   Eventually, the three young men decided to go to Godfrey's
  apartment on Darwin Street. Ingle stopped at the AM-PM store a
15   couple of blocks from Godfrey's apartment, hoping to buy
  marijuana at that location. Godfrey and Breen drove to Darwin
16   Street, parked outside the apartment complex, and waited for Ingle.

17   Ingle saw a black van outside the AM-PM store and signaled the
  people around the van by putting two fingers to his lips as if he
18   were smoking. A man later identified as defendant approached
  Ingle and asked what he wanted. Ingle told defendant he was
19   looking for $10 worth of marijuana. Defendant said they had it.
  Because Ingle had no money, the two agreed that defendant would
20   ride with Ingle two blocks to where Godfrey was waiting on
  Darwin Street, and the van would follow.

21
  Once on Darwin Street, defendant instructed Ingle to make a
22   U-turn and park his car in front of the car where Breen and
  Godfrey were sitting. The van parked across the street facing the
23   opposite direction.

24   Defendant got out of Ingle's car, walked up to the driver's window
  of Breen's car, and asked Breen if he wanted some weed. Breen
25   said, "Just a ten sack." Breen opened his wallet, took several bills
  out, and held them in his hand. Defendant took all of the money
26   and said, "[Y]ou might as well get a 20." Defendant walked to the

van, leaned in the driver's window, reached for something with both hands, and tucked an object in his sleeve.

Returning to Breen's open car window, defendant said, "Hey, Homie, check out this sack," and struck Breen in the head. Defendant told Breen and Godfrey to take off their seat belts and give him "all [their] shit."  When defendant discovered there was no money in Godfrey's wallet, he threw it back at him.

Breen did not move. Defendant reached in, unbuckled Breen's seat belt, pulled Breen out, threw him roughly against the car, and went through his pockets. Godfrey saw a red disposable lighter fall out of Breen's pocket. When Godfrey got out of the passenger side of the car and stood up, he saw Breen facing the car with his head on the roof and his hands spread out. Defendant was standing behind Breen holding a gun to his head.

Godfrey started moving toward the back of the car. He heard the driver of the van yell "[H]urry up" and "Kill that motherfucker." A female voice from inside the van called out, "[H]urry up and kill him. Shoot him." Another male voice yelled, "Kill that White Bitch." Godfrey told defendant, "[J]ust take the wallet.... Whatever. Just don't shoot us." Someone in the van responded, "[S]hoot him too. He's gonna snitch."

Defendant backed up, still holding the gun, until he was three feet away from Breen. Godfrey told Breen not to worry. Breen remained where he was against the car, but put his arms down.

Defendant shot Breen three times in quick succession. He pointed the gun at Godfrey, who was eight to ten feet away, and Godfrey got on the ground. At that point, defendant ran back to the van, and the van drove off.

Ingle, who had watched everything from his car, made a U-turn and stopped to talk to Godfrey. Ingle and Godfrey agreed that Godfrey would stay with Breen and Ingle would chase the van.

Godfrey helped Breen walk toward the apartment complex, but Breen ended up on the ground. He was still breathing and had a pulse when sheriff's deputies arrived. Deputy Jeffrey Brace performed CPR until medical personnel took over, but Breen died of the gunshot wounds at the scene.

Ingle pursued the van on the freeway and called 911 on his cell phone. He reported that he was following a van and one of the occupants had just shot his cousin. During the chase, Ingle rammed the back of the van. He left the freeway and returned to Darwin Street when he saw the law enforcement vehicles enter the freeway.

Sheriff's deputies contacted the occupants of the van when they left the freeway and pulled into a gas station at Florin Road and East Parkway. Deputy Brace drove Godfrey to the gas station where Godfrey recognized the van and identified defendant as the shooter. Godfrey also identified the driver, Jaquan Johnson. At the scene, the deputies identified the front passenger as Thomas Frazier and the left rear passenger as Kenyetta Reeves.

Homicide detective Will Bayles searched the van. He noticed a three-inch depression in the rear bumper.  Bayles recovered a Smith and Wesson five-shot revolver in a green container in the back of the van. Deputies found two spent cartridge cases on the back seat. No marijuana was found in the van.

On Darwin Street, at the scene of the shooting, officers recovered one spent round on the street eight to ten feet from the car Breen had been driving. They also found a red disposable lighter on the ground 18 to 24 inches away from the car.  Criminalist Faye Springer concluded the spent bullet had been fired from the gun found in the van. She also testified the spent cartridges found on the back seat of the van had been fired by the same gun. Springer examined the gun residue kits collected from the four occupants of the van. Based on the particles found, she concluded that both defendant and Reeves had fired a gun, handled a fired gun or fired ammunition, or had been near a gun when it was fired.

Detective Ron Garverick questioned defendant at the Sheriff's Department around 10:00 a.m. on September 19, 2003, and videotaped the interview. Defendant described meeting Ingle at the convenience store and riding with him to Darwin Street. He told Garverick that he had shot a gun around dusk the day before. At that point, defendant asked to speak with Kenyetta Reeves, the woman who had been with him in the van. Detective Garverick put them in the same interview room and taped their conversation. The prosecution played the tape for the jury. Defendant told Reeves:

"They don't-they have no motive. They have nothing but the two cats saying they can identify me. [] ... [] They know I-I'm the only one that came back positive that shot that gun. I'm going to do some-I-I can't beat the-they got the murder weapon. They-fuck them all. They got the murder weapon. Then they got the gunpowder positive on my hands. It's all bad. [] Ain't nobody prints on it. I wiped it down when (Unintelligible) (Unintelligible) from when you gave it to me and I was trying to re-load it. No fingerprints is on there. So I was telling you before I-you seen me dealing with-you know, went like this or-this or-you don't touch a gun. I-I deal with things, too, and you don't touch guns. [] Dude died-he died ... right there. [] ... [] I shot him all them bullets went through his body to the car. I shot him closer than you-what-what me and you is. That's how I know I ain't going to miss him."

Detective Garverick resumed his questioning of defendant after

Reeves left. During this conversation, defendant stated at times that he was not the shooter and at other times that he was. Defendant denied that he had robbed Breen. The defense presented no evidence at trial.

Near the end of defendant's trial, defense counsel filed a written request for a pinpoint instruction of voluntary manslaughter on a theory of imperfect self-defense. In support of her request she acknowledged in her argument that the prosecutor had decided, "to proceed strictly on a theory of felony murder, robbery murder, and not on a theory of premeditation and deliberation or any lesser-included offenses." Rejecting the suggestion there were no lesser included offenses in felony murder, defense counsel maintained it was arguable there was no attempted robbery, but "what was going on was a drug deal in which chaos erupted and a killing occurred." Citing People v. Valdez (2004) 32 Cal.4th 73, she argued the jury should be allowed to determine the degree of the killing. Defense counsel asserted the evidence supported an inference that defendant held an unreasonable but honest belief in the need for self-defense.

The court denied the request for an instruction on voluntary manslaughter, finding: "[T]here is no substantial evidence to support a voluntary manslaughter instruction on actual but unreasonable self-defense or heat of passion. The arguments posited by the defense, although creative, are based sheerly on speculation. All the evidence which has been presented during the course of this trial, which the jury will evaluate, pointed to a botched robbery. No marijuana was ever found in the van or [at] the scene. There is no evidence the victim was armed or took any aggressive action at all towards the defendant to justify his being shot in the back three times. The only evidence is that he passively complied. [] Further, there is no evidence of heat of passion. [] It does not legally matter if the killing is intentional, unintentional or accidental if it was done in the course of an attempted robbery."

In closing argument, defense counsel conceded that defendant shot Breen but argued there was insufficient evidence of an attempted robbery. Instead, defense counsel maintained the victim was shot in a drug deal gone bad. The jury rejected the defense theory.

(Lod. Doc. 12 at 2-9.)[2]

\\\\\

\\\\\

\\\\\

---

[2] Unless otherwise indicated, Lodged Documents refer to those documents lodged by respondent on August 1, 2011.  (Dkt. No. 32; see also Dkt. No. 48.)

1  II.  Procedural History

2         Petitioner's first trial for the murder of Bryan Breen began in March 2005 in the

3  Sacramento County Superior Court.  Jury deliberations began on April 5, 2005.  On April 13,

4  2005, the trial court declared the jury to be deadlocked and discharged the jurors.  4 Record of

5  Transcript ("RT") 989.

6         Petitioner's second trial for the murder of Bryan Breen took place in June 2005 in

7  the Sacramento County Superior Court.  The  jury found him guilty of first degree murder in

8  violation of California Penal Code section 187(a) and attempted robbery in violation of

9  California Penal Code sections 211 and 664.  The jury found, as a special circumstance, that the

10  murder was committed while petitioner was engaged in the commission or attempted

11  commission of the crime of robbery.  See Cal. Penal Code § 190.2(a)(17).  The jury further found

12  true a sentencing enhancement allegation that petitioner had caused great bodily injury.  See Cal.

13  Penal Code § 1202253(d).  2 Clerk's Transcript ("CT") 356-57.  On August 19, 2005, petitioner

14  received an aggregate sentence of twenty-five years to life imprisonment, plus a consecutive

15  indeterminate term of life imprisonment without the possibility of parole.  2 CT 412.

16         Petitioner appealed the judgment to the California Court of Appeal for the Third

17  Appellate District.[3] (Lod. Doc. 9.)  On November 28, 2006, the judgment was affirmed in a

18  reasoned opinion.  (Lod. Doc. 12 ("Opinion").)   Petitioner then filed a petition for review in the

19  California Supreme Court.  (Lod. Doc. 1.)  On February 7, 2007, the California Supreme Court

20  summarily denied the petition.  (Lod. Doc. 2.)

21         Petitioner commenced the instant action on January 25, 2008.  (Dkt. No. 1.)  On

22  May 27, 2009, petitioner was granted a stay of this action so that he could exhaust state court

23

24         [3] Petitioner's opening brief on appeal made one argument: that petitioner "was entitled to
jury instructions on lesser included offenses, because there was evidence to raise a reasonable
25  doubt on the elements of premeditation and malice, and because the prosecution elected in the
first trial to pursue conviction on a theory of premeditation." (Lod. Doc. 9.)  Petitioner did not
26  argue on direct appeal, as he does herein, that the trial court improperly excluded certain
impeachment evidence.

1   remedies as to certain additional claims.  (Dkt. No. 22.)  The stay was lifted on June 7, 2011.

2   (Dkt. No. 11.)  Ultimately, however, petitioner chose not to pursue those additional claims,

3   which he conceded were time-barred pursuant to 28 U.S.C. § 2244(d).  (See Dkt. No. 41.)

4   Petitioner filed the operative third amended petition on September 30, 2011.  (Ptn.)  Respondent

5   filed an answer (Dkt. No. 47), and petitioner filed a traverse (Dkt. No. 57).

6                                         ANALYSIS

7   I.  AEDPA

8              The statutory limitations of federal courts' power to issue habeas corpus relief for

9   persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and

10  Effective Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

11          An application for a writ of habeas corpus on behalf of a person in
            custody pursuant to the judgment of a State court shall not be
12          granted with respect to any claim that was adjudicated on the
            merits in State court proceedings unless the adjudication of the
13          claim-

14                  (1) resulted in a decision that was contrary to, or
                    involved an unreasonable application of, clearly
15                  established Federal law, as determined by the
                    Supreme Court of the United States; or
16
                    (2) resulted in a decision that was based on an
17                  unreasonable determination of the facts in light of
                    the evidence presented in the State court
18                  proceeding.

19             As a preliminary matter, the Supreme Court has recently held and reconfirmed

20  "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to

21  have been 'adjudicated on the merits.'"  Harrington v. Richter, 131 S. Ct. 770, 785 (2011).

22  Rather, "when a federal claim has been presented to a state court and the state court has denied

23  relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

24  of any indication or state-law procedural principles to the contrary."  Id. at 784-785, citing Harris

25  v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear

26  whether a decision appearing to rest on federal grounds was decided on another basis).  "The

1   presumption may be overcome when there is reason to think some other explanation for the state

2   court's decision is more likely."  Id. at 785.

3          The Supreme Court has set forth the operative standard for federal habeas review

4   of state court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an

5   *unreasonable* application of federal law is different from an *incorrect* application of federal

6   law.'"  Harrington, supra, 131 S. Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410 (2000).

7   "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

8   'fairminded jurists could disagree' on the correctness of the state court's decision."  Id. at 786,

9   citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).  Accordingly, "a habeas court must

10  determine what arguments or theories supported or . . could have supported[] the state court's

11  decision; and then it must ask whether it is possible fairminded jurists could disagree that those

12  arguments or theories are inconsistent with the holding in a prior decision of this Court."  Id.

13  "Evaluating whether a rule application was unreasonable requires considering the rule's

14  specificity.  The more general the rule, the more leeway courts have in reaching outcomes in

15  case-by-case determinations.'"  Id.  Emphasizing the stringency of this standard, which "stops

16  short of imposing a complete bar of federal court relitigation of claims already rejected in state

17  court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does

18  not mean the state court's contrary conclusion was unreasonable."  Id., citing Lockyer v.

19  Andrade, 538 U.S. 63, 75 (2003).

20         The undersigned also finds that the same deference is paid to the factual

21  determinations of state courts.  Under § 2254(d)(2), factual findings of the state courts are

22  presumed to be correct subject only to a review of the record which demonstrates that the factual

23  finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in

24  light of the evidence presented in the state court proceeding."  It makes no sense to interpret

25  "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in

26  § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the

1   same record could not abide by the state court factual determination.  A petitioner must show

2   clearly and convincingly that the factual determination is unreasonable.  See Rice v. Collins, 546

3   U.S. 333, 338 (2006).

4          The habeas corpus petitioner bears the burden of demonstrating the objectively

5   unreasonable nature of the state court decision in light of controlling Supreme Court authority.

6   Woodford v. Viscotti, 537 U.S. 19 (2002).  Specifically, the petitioner "must show that the state

7   court's ruling on the claim being presented in federal court was so lacking in justification that

8   there was an error well understood and comprehended in existing law beyond any possibility for

9   fairminded disagreement."  Harrington, supra, 131 S.Ct. at 786-787.  Clearly established" law is

10   law that has been "squarely addressed" by the United States Supreme Court.  Wright v. Van

11   Patten, 552 U.S. 120, 125 (2008).  Thus, extrapolations of settled law to unique situations will

12   not qualify as clearly established.  See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006)

13   (established law not permitting state sponsored practices to inject bias into a criminal proceeding

14   by compelling a defendant to wear prison clothing or by unnecessary showing of uniformed

15   guards does not qualify as clearly established law when spectators' conduct is the alleged cause

16   of bias injection).  The established Supreme Court authority reviewed must be a pronouncement

17   on constitutional principles, or other controlling federal law, as opposed to a pronouncement of

18   statutes or rules binding only on federal courts.  Early v. Packer, 537 U.S. 3, 9 (2002).

19          The state courts need not have cited to federal authority, or even have indicated

20   awareness of federal authority in arriving at their decision.  Early, supra, 537 U.S. at 8. Where the

21   state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the

22   federal court will independently review the record in adjudication of that issue.  "Independent

23   review of the record is not de novo review of the constitutional issue, but rather, the only method

24   by which we can determine whether a silent state court decision is objectively unreasonable."

25   Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

26   \\\\\

1    Finally, if the state courts have not adjudicated the merits of the federal issue, no

2    AEDPA deference is given; the issue is reviewed *de novo* under general principles of federal law.

3    James v. Ryan, ___ F.3d ___, 2012 WL 639292 *18-19 (9th Cir. 2012).

4    II. Petitioner's Claims

5    A. Lesser Included Offenses

6         1. Voluntary Manslaughter

7              In Claim 1, petitioner alleges that the trial court improperly denied his request for

8    a pinpoint instruction on the lesser included offense of voluntary manslaughter based on the

9    theory of imperfect self-defense.   Petitioner sought the following instruction:

> A person who kills another person in the actual but unreasonable
> belief in the necessity to defend against imminent peril to life or
> great bodily injury, kills unlawfully but does not harbor malice
> aforethought and is not guilty of murder.  This would be so even
> though a reasonable person in the same situation seeing and
> knowing the same facts would not have had the same belief.  Such
> an actual but unreasonable belief is not a defense to the crime of
> voluntary manslaughter.
>
> As used in this instruction, an 'imminent' peril or danger means
> one that is apparent, present, immediate, and must be instantly
> dealt with, or must so appear at the time to the slayer.

17   2 CT 352, citing CALJIC 5.17.  See CALCRIM 604, Attempted Voluntary Manslaughter:

18   Imperfect Self-Defense–Lesser Included Offense (Pen. Code §§ 21a, 192, 664).  In a California

19   murder case, the jury should be instructed on the lesser included offense of voluntary

20   manslaughter if there is substantial evidentiary support for the theory that the defendant lacked

21   malice, either because he acted upon a sudden quarrel or heat of passion or because he acted in

22   the unreasonable but good faith belief in the need to act in self-defense.  People v. Breverman, 19

23   Cal. 4th 142, 159-160 (1998).  As to the latter, "[t]he doctrine of imperfect self defense is

24   narrow.  'It requires without exception that the defendant must have had an *actual* belief in the

25   need for self-defense. . . . The defendant's fear must be of *imminent* danger to life or great bodily

26   injury.  Put simply, the trier of fact must find an actual fear of an imminent harm.  Without this

10

1  finding, imperfect self-defense is no defense.'" 1 Witkin, Cal. Crim. Law 4th (2012), Defenses, §

2  82(3)(c) (italics in original), citing In re Christian S., 7 Cal. 4th 768, 783 (1994).

3       When petitioner's motion for this instruction came before the trial court, the

4  prosecutor had elected to proceed strictly on a theory of felony murder, specifically that petitioner

5  shot Breen in the course of attempting to rob him.  See 6 RT 2348.  In arguing for a lesser

6  offense instruction, defense counsel conceded that "if the jury finds that there was a robbery and

7  a murder, that is a first degree felony murder."  Id.  "I'm not asking for a lesser to that[. . . .

8  However,] I believe that in this case what is certainly arguable is that there was no robbery . . . or

9  attempted robbery, that what was going on was a drug deal in which chaos erupted and a killing

10  occurred.  And under those circumstances I believe that the jury should be allowed to determine

11  the degree of the killing."  Id. at 2348-2349.

12       Defense counsel argued that witnesses Godfrey and Ingle, who "testified that what

13  occurred . . . appeared to be an attempted robbery," were not credible, and that there was no

14  evidence that petitioner had robbed or attempted to rob Breen, whose "wallet was found in his

15  pocket when he was taken to the hospital."  Id. at 2350.  Rather, when "chaos erupted," and Ingle

16  started "jumping in and out of the [stolen] car [he was in]"; and Godfrey "jumped out of the

17  passenger seat and started coming around the trunk end of the vehicle toward" petitioner; and

18  petitioner's "friends in the van started yelling words to the effect of, shoot, kill"; and it was "very

19  dark"; it was plausible that petitioner had an "honest but unreasonable belief in the need for self-

20  defense," his counsel argued.  Thus, petitioner "put his arm out, and he shot, and the closest

21  target was Bryan Breen."  Id. at 2351.

22       The trial court denied the motion.  In its summary of the relevant evidence, the

23  trial court found that petitioner

24          pulled the victim out of his car and began going through the
        victim's pockets.  He pointed a gun at the victim and began

25          stepping back.  At this time his associates were encouraging him to
        shoot the victim.

26

> As he stepped back he fired three shots into the back of the victim. After pointing the gun at the passenger [Godfrey] without firing a shot, the defendant returned to the van and fled the scene.

Id. at 2358.  "All the evidence . . . points to a botched robbery," the trial court concluded.  ". . . There is no evidence the victim was armed or took any aggressive action at all towards the defendant to justify his being shot in the back three times.  The only evidence is that he passively complied."  The trial court observed that petitioner did not shoot at Ingle or Godfrey, who were moving around during the "chaos" described by defense counsel.  (Id. at 2358.)  Thus there was "no substantial evidence" to support an instruction on voluntary manslaughter on the theory of imperfect self-defense.  Id. at 2359.  The jury was instructed on felony murder in the course of an attempted robbery, and returned a finding of guilty.  Augmented CT 20; 2 CT 357.

In affirming the trial court's ruling on the voluntary manslaughter instruction, the Third Appellate District wrote:

> Defendant argues the court erred in denying his request for an instruction on voluntary manslaughter.  He notes the first trial went to the jury on theories of premeditated murder and felony murder, and contends the prosecution was bound by that "election" in the second trial. Defendant also maintains that even if the prosecution "could add a felony murder theory in the second trial, it could not abandon the premeditation theory to which [defendant] had committed his defense." We disagree.
>
> First, the prosecution was not required to elect which murder theory or theories it intended to pursue at trial. The information charged defendant with an open count of murder. And the special circumstance charged in the information gave defendant notice that the prosecution would proceed on a theory of felony murder as well as the theory of deliberate premeditated murder.  In this way, depending upon how the evidence and its strength developed at trial, the prosecutor would be able to argue either or both theories of first degree murder.
>
> Where the evidence reveals multiple acts on which the jury could convict defendant of a single crime, the prosecution must elect which act supports conviction. Alternatively, the court is required to instruct the jury it must agree on the specific act which constitutes the crime.  (People v. Russo (2001) 25 Cal.4th 1124, 1132 (Russo).)  However, the prosecution is not required to elect among alternative legal theories. (People v. Ryan (2006) 138 Cal.App.4th 360, 368.)  Nor is the jury required to agree

unanimously on the particular theory under which defendant is
found guilty. (Russo, supra, at p. 1132.) Because the prosecution
was not required to elect among theories, it was not bound by any
perceived election made in the first trial.

Second, citing Sheppard v. Rees (9th Cir. 1990) 909 F.2d 1234,
1237 (Sheppard), defendant argues that the prosecution's decision
late in the second trial to argue only felony murder "ambushed" the
defense and deprived him of due process.  Specifically, he suggests
that the prosecutor's decision prevented him from obtaining
instructions on lesser included offenses to premeditated murder.
Sheppard is readily distinguishable from the case before us.  In that
case, the information charged Sheppard with one count of murder
and use of a firearm.  "At no time during pre-trial proceedings,
opening statements, or the taking of testimony was the concept of
felony-murder raised, directly or indirectly." (Id. at p. 1235.)  The
Ninth Circuit held that Sheppard did not receive adequate notice to
enable him to prepare a defense to felony murder. (Ibid.)  In this
case, the amended information charged defendant with murder and
placed him on notice of the possibility of conviction based on a
felony murder theory.  (People v. Hughes (2002) 27 Cal.4th 287,
369-370.)  In addition, the information specifically alleged the
attempted robbery felony murder special circumstance as to the
murder count and count two charged attempted robbery.  If these
charges were not enough to put the defense on notice of the felony
murder theory of guilt, the prosecution's decision to proceed on
both theories in the first trial eliminated any question regarding the
sufficiency of defendant's notice under Sheppard.

Third, the court denied defendant's request for instructions on
voluntary manslaughter because there was no evidence to support
those instructions, not because the prosecution decided to pursue
the felony murder theory at the end of the second trial.  " ' "It is
settled that in criminal cases, even in the absence of a request, the
trial court must instruct on the general principles of law relevant to
the issues raised by the evidence. [Citations.] The general
principles of law governing the case are those principles closely
and openly connected with the facts before the court, and which are
necessary for the jury's understanding of the case." [Citation.]  That
obligation has been held to include giving instructions on lesser
included offenses when the evidence raises a question as to
whether all of the elements of the charged offense were present
[citation], but not when there is no evidence that the offense was
less than that charged. [Citations.]' " ( People v. Breverman (1998)
19 Cal.4th 142, 154.)

On appeal, we review the record to determine if there was
substantial evidence to warrant an instruction on the lesser offense.
(People v. Dennis (1998) 17 Cal.4th 468, 507.) "Substantial
evidence in this context is evidence from which a rational trier of
fact could find beyond a reasonable doubt the elements of the

lesser offense. [Citation.] '[S]peculation is not evidence, less still substantial evidence. [Citation.]' [Citation.]" (<u>Id</u>. at p. 508.)

We conclude the record supports the court's ruling there was "no substantial evidence to support a voluntary manslaughter instruction on actual but unreasonable self-defense or heat of passion." As the trial court explained, all the evidence pointed to "a botched robbery."

. . .

Defendant also argues the evidence "could have supported a conclusion that the shooting was provoked by the perceived threat of Breen's companions." The court's duty to instruct on voluntary manslaughter based on imperfect or unreasonable self defense arises only where there is substantial evidence from which reasonable jurors could conclude the defendant actually believed he was in imminent danger of death or great bodily injury. (<u>In re Christian S.</u> (1994) 7 Cal.4th 768, 773, 783.) "[T]the trier of fact must find an actual fear of an imminent harm." (<u>Id</u>. at p. 783, italics omitted.)

There is no evidence here that defendant feared imminent harm from anyone. On the contrary, the evidence revealed defendant controlled these three men and terrorized Godfrey and Breen, ultimately killing Breen. Only defendant was armed. He had Breen completely under his control in the car and against the car. Godfrey posed no threat because he was eight to ten feet away and moving toward the rear of the car when defendant shot Breen. Ingle posed no threat because he was inside his car the entire time, watching events through his mirror.

We conclude the court did not err in denying defendant's request to instruct the jury on lesser included offenses.

(Opinion at 9-14.)

In a non-capital case such as this one, the "[f]ailure of a state court to instruct on a lesser offense fails to present a federal constitutional question and will not be considered in a federal habeas proceeding." <u>Bashor v. Risley</u>, 730 F.2d 1228, 1240 (9th Cir. 1984). In <u>Beck v. Alabama</u>, 447 U.S. 625, 638 (1980), the Supreme Court held that criminal defendants possess a constitutional right to have the jury instructed on a lesser included offense in a capital case. However, the <u>Beck</u> court expressly reserved the question of whether due process mandates the application of the same right in non-capital cases. <u>See</u> 447 U.S. at 638, n. 14. The right to have

14

a jury instructed on a lesser included offense is not clearly established federal law in a

non-capital case and consequently, the failure of a state trial court to instruct on a lesser included

offense does not present a federal constitutional question.  See Windham v. Merkle, 163 F.3d

1092, 1106 (9th Cir.1998) ("Under the law of this circuit, the failure of a state trial court to

instruct on lesser included offenses in a non-capital case does not present a federal constitutional

question."); Franklin v. Trimble, 2012 WL 3276986 JAM DAD P, *10 (E.D. Cal. Aug. 9, 2012).

        In Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000), the Ninth Circuit stated that

there may be an exception to this general rule which would require adequate jury instructions on

a defendant's defense theory.  However, even if petitioner possessed this right, he still would not

be entitled to federal habeas relief with respect to this claim.  The California Court of Appeal

found no error in the trial court's refusal to instruct on imperfect self-defense because there was

not substantial evidence to support this theory, and the undersigned agrees.  The record does not

suggest that petitioner accidently shot Breen – who was passively complying with his commands

– while in actual fear of imminent harm from Godfrey, Ingle, petitioner's associates in the van, or

some combination thereof.  Accordingly, the state court's decision on this issue was reasonable

under AEDPA.

        2. Second Degree Murder

        In the operative third amended petition, petitioner mentions only the lesser offense

of voluntary manslaughter.  However, as respondent points out, petitioner uses the plural term

"lesser included offenses."  He also argued for a second degree murder instruction in his first

amended petition.  (See Dkt. No. 8 at 11 (arguing that "the court had a *sua sponte* duty to instruct

on the lesser included offense of second degree murder, as well as on the requested lesser

included offense of voluntary manslaughter"); see also Dkt. No. 41 at 2 (construing third

amended petition to raise same claims as first amended petition).)  Thus, like respondent, the

undersigned presumes petitioner to claim that he was entitled to a *sua sponte* instruction on

second degree murder.

In his traverse, petitioner argues:

> At the time Breen was shot, any attempted robbery was abandoned, and Breen being shot could have been viewed by the jury as just a senseless act of violence committed out of frustration of an incomplete robbery, or the coaxing of the van's occupants.  Either way, there was in fact sufficient evidence to support an instruction on second degree murder[.] . . . Once defense counsel informed the court it was the[ir] defense theory that the crime was just senseless killing, and that there was no attempt to rob at the time of the fatal shooting, the defense was entitled to instructions on the lesser offense of second degree murder[.]

(Dkt. No. 57 at 20-22.)

Addressing this claim on appeal, the Third Appellate District wrote:

> Defendant maintains "[t]he attempted robbery was over before Breen was forced out of the car," and suggests this type of "senseless" killing is "the standard fare of street confrontations ... typically dubbed intentional but non-premeditated second degree murders."  However, evidence that defendant armed himself, returned to Breen's car, hit Breen, demanded that Breen and Ingle give him their property, and pulled Breen out of the car demonstrated defendant had formed the intent to rob Breen and was putting that plan into action. [Citations.]
>
> In furtherance of the robbery plan the record shows defendant went through Breen's pockets after he pulled him from the car. Godfrey saw a red disposable lighter fall from Breen's pocket which the deputies later found on the ground next to Breen's car. Defendant shot Breen three times in the back, he then pointed the gun at Godfrey who jumped to the ground. At that point, defendant ran to the van, and the van drove away.  Ingle gave chase. And the robbery was not complete until the robber reached a place of temporary safety.  (People v. Young (2005) 34 Cal. 4th 1149, 1177 .) Godfrey and Ingle testified in detail regarding the events that led up to the killing and the physical evidence was consistent with their account. There is nothing in this record to support defendant's suggestion the attempted robbery ended while Breen was still in the car.

(Opinion at 12-13.)

Assuming arguendo that it can consider this claim on the merits (see Solis, supra, 219 F.3d at 929), the undersigned concludes that the decision of the California Court of Appeal that there was insufficient evidence to warrant an instruction on second degree murder was not based on an unreasonable determination of the facts.  The evidence at trial showed that, while

16

1   Breen was still in the car, petitioner told him and Godfrey to take off their seat belts and give him

2   their wallets.  4 RT 1942.  Godfrey gave petitioner his wallet, but petitioner looked inside, saw

3   there was no money, and threw it back at him.  4 RT 1850.  When Breen did not move, petitioner

4   reached in and unbuckled his seat belt.  4 RT 1852.  Petitioner then opened the car door and

5   pulled Breen out.  4 RT 1852.

6          Contrary to petitioner's theory that the attempted robbery was over at this point,

7   petitioner threw Breen up against the car and went through Breen's pockets.  4 RT 1853, 1855,

8   1857; 5 RT 2069-70.  The state court reasonably found this action was "[i]n furtherance of the

9   robbery plan . . ."  (Opinion at 13.)  Petitioner then backed away and shot Breen in the back three

10  times in rapid succession.  4 RT 1862-64, 2005.  Because the state court's determination was

11  reasonable under AEDPA, petitioner is not entitled to federal habeas relief on this claim.[4]

12  B.  Impeachment Evidence

13         In Claims 2 and 3, petitioner alleges that the trial court violated his due process

14  rights by excluding evidence that Ingle possessed a firearm on November 12, 2003, nearly two

15  months after Breen's murder.  Petitioner asserts that he would have used this evidence to impeach

16  Ingle, who said during his 911 call, "I don't really know anything about guns."  (Ptn. at 4-5; see 2

17  CT 423.)  In arguing for the admissibility of this evidence at petitioner's second trial, defense

18  counsel urged that it went to Ingle's credibility and also suggested that Ingle might have had a gun

19  at September 2003 incident, i.e., that "there may have been another gun on the scene[.]"  4 RT

20  1807-1808.  The trial court excluded this evidence, reasoning that whether Ingle possessed a

21

22         [4] Petitioner also briefly asserts that the prosecution's "election to pursue felony murder at
    the conclusion of the presentation of evidence [violated his] right to adequate notice[.]" (Ptn. at
23  4.)  The undersigned finds that the state court reasonably rejected this argument by observing that
    the information put petitioner on notice of the charge against him.  See Stephens v. Borg, 59 F.3d
24  932, 935 (9th Cir. 1995) ("[U]nder clear California law, the jury may be instructed on felony
    murder even though the indictment does not expressly set out such a theory."), citing People v.
25  Gallego, 52 Cal. 3d 115 (1990) (noting well-established rule that "a pleading charging murder
    adequately notifies a defendant of the possibility of conviction of first degree murder on a felony-
26  murder theory.")

1  firearm two months after Breen's death was "very collateral," as there was no evidence that Ingle

2  possessed a gun on September 19, 2003.  4 RT 1809-1810.

3          Respondent argues that this claim is procedurally barred due to the state court's

4  invocation of In re Dixon, 41 Cal. 2d 765 (1953).

5          Petitioner presented this claim to the California Supreme Court in a habeas petition

6  filed January 1, 2008.  (Lod. Doc. 3.)  The Court summarily denied the petition on July 9, 2008,

7  citing Dixon, supra, 41 Cal. 2d 756;  In re Swain, 34 Cal. 2d 300, 304 (1949); and People v.

8  Duvall, 9 Cal. 4th 464, 474 (1995).  The citation to Dixon indicates that the Court found the claim

9  to be barred because petitioner should have raised it on direct appeal.[5]  See 41 Cal. 2d at 759

10  ("The general rule is that habeas corpus cannot serve as a substitute for an appeal, and, in the

11  absence of special circumstances constituting an excuse for failure to employ that remedy, the writ

12  will not lie where the claimed errors could have been, but were not, raised upon a timely appeal

13  from a judgment of conviction.")

14          As a general rule, "[a] federal habeas court will not review a claim rejected by a

15  state court if the decision of [the state] court rests on a state law ground that is independent of the

16  federal question and adequate to support the judgment."  Walker v. Martin, —— U.S. ——, ——,

17  131 S.Ct. 1120, 1127 (2011) (quoting Beard v. Kindler, 558 U.S. 53 (2009).)  Procedural default

18  can only block a claim from federal habeas review if the state court, "clearly and expressly states

19  that its judgment rests on a state procedural bar."  Harris v. Reed, 489 U.S. 255, 263.  This means

20  that the state court must have specifically stated that it was denying relief on a procedural ground.

21  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991); Acosta–Huerta v. Estelle, 7 F.3d 139, 142

22  (9th Cir. 1993).

23  \\\\\

24  \\\\\

25  _____

26  [5] Respondent does not assert procedural bars based on the California Supreme Court's
citations to Swain and Duvall.

1    In the instant case, the California Supreme Court's invocation of <u>Dixon</u> serves as

2 an independent and adequate state ground.[6]  <u>See</u> <u>Gibson v. Hartley</u>, 2012 WL 4468505, at *10

3 (E.D. Cal. Sept. 26, 2012) ("Because the state court's reliance on <u>Dixon</u> in denying the instant

4 claim is an independent and adequate state ground, this claim is procedurally defaulted unless

5 petitioner can show cause for the default and actual prejudice . . . or that failure to consider the

6 claims will result in a fundamental miscarriage of justice."); <u>Cantrell v. Evans</u>, 2010 WL

7 1170063, at *13–14 (E.D. Cal. Mar. 24, 2010) (McKeown, J., sitting by designation) ("[T]he

8 procedural bar established by <u>In re Dixon</u> .... is an adequate and independent state law reason for

9 refusing to reach the merits ...[.]")

10    Therefore Claims 2 and 3 are procedurally defaulted unless petitioner can show

11 cause for the default and actual prejudice as a result of the alleged violation of federal law, or that

12 failure to consider the claims will result in a fundamental miscarriage of justice.  <u>See</u> <u>Coleman v.</u>

13 <u>Thompson</u>, 501 U.S. 722, 750 (1991).

14    In his traverse, petitioner argues that, in addition to impeaching Ingle's credibility,

15 the excluded testimony that Ingle possessed a gun in November 2003 would have "further

16 supported the defense theory that there may have been movement causing petitioner to shoot."  He

17 similarly argues that this testimony "could allow the jury to infer that there was movement to

18 justify the belief that [petitioner] was in danger, . . . thus the state court's decision to exclude this

19 evidence was prejudicial to petitioner."  (Dkt. No. 57 at 25-26.)  Petitioner also points out that the

20 first trial, at which this evidence was admitted, resulted in a hung jury.  (<u>Id</u>. at 25.)

21    Petitioner's arguments for actual prejudice are not persuasive.  Testimony that a

22 witness to the September 2003 incident possessed a gun in November 2003, or even lied about his

23 familiarity with guns, would not suggest to a jury any particular movement at the time petitioner

24

25    [6] Petitioner's claim of improperly excluded evidence is based on conduct which is
reflected in the trial record and not on any extra-record evidence, which means it could have been
26 raised on direct appeal.

19

1   shot Breen, or suggest any reason petitioner would have been in fear at the time of the shooting.

2   Moreover, the second trial court was not bound by the evidentiary ruling of the first trial court as

3   to the admissibility of the impeachment evidence concerning Ingle.  See People v. McDowell, 54

4   Cal. 4th 395, 430 (2012) ("Applying our standard of review for discretionary determinations, we

5   find no abuse of discretion in the trial court's decision to exclude the expert opinion testimony of

6   Dr. Andrews at the second penalty retrial in this case[]" despite the fact that this evidence was

7   admitted in the first penalty retrial); see also id. at 428, n. 22 ("Our only inquiry . . . is whether the

8   trial court's decision to exclude the expert opinion testimony constituted an abuse of discretion.").

9           Here, the trial court reasonably found that evidence that Ingle possessed a gun two

10   months after Breen's death was collateral to whether petitioner was guilty of the offenses charged.

11   In the absence of any evidence that Ingle had a gun at the time of Breen's death, defense counsel's

12   theory that there "may have been another gun on the scene" possessed by Ingle, was merely

13   speculative.  The trial court's exclusion of the November 2003 impeachment evidence was not a

14   fundamental miscarriage of justice.  Accordingly, petitioner's Claims 2 and 3 should be denied as

15   procedurally barred.

16   III.  Conclusion

17           In sum, based on the foregoing analysis, the undersigned finds that petitioner's

18   Claim 1 should be denied on the merits and Claims 2 and 3 should be denied as procedurally

19   barred.

20           Accordingly, IT IS HEREBY ORDERED THAT the Clerk of Court substitute Tim

21   Virga as respondent in the docket of this action.

22            IT IS HEREBY RECOMMENDED that:

23           1.  The petition for writ of habeas corpus (Dkt. No. 37) be denied in its entirety:

24   Claim 1 on the merits and Claims 2 and 3 as procedurally barred.

25           2.  This case be closed.

26   \\\\\

1          These findings and recommendations are submitted to the United States District

2   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

3   days after being served with these findings and recommendations, any party may file written

4   objections with the court and serve a copy on all parties.  Such a document should be captioned

5   "Objections to Magistrate Judge's Findings and Recommendations."  In his objections petitioner

6   may address whether a certificate of appealability should issue in the event he files an appeal of

7   the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district

8   court must issue or deny a certificate of appealability when it enters a final order adverse to the

9   applicant).  Any reply to the objections shall be served and filed within fourteen days after service

10  of the objections.  The parties are advised that failure to file objections within the specified time

11  may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir.

12  1991).

13   Dated: October 15, 2012

14                                                  _Carolyn K. Delaney_____
15                                                  CAROLYN K. DELANEY
                                                    UNITED STATES MAGISTRATE JUDGE
16

17

18  2
    hold183.hc
19

20

21

22

23

24

25

26